FOR PUBLICATION                    [Dkt. Ents. 31, 34, 35]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

## CAMDEN VICINAGE

| | |
|---|---|
| MOORESTOWN TOWNSHIP BOARD OF EDUCATION,<br><br>                    Plaintiff,<br><br>     v.<br><br>S.D. and C.D. on behalf of M.D.,<br><br>                    Defendants. | Civil No. 10-0312(RMB/JS)<br><br>     **OPINION** |

Appearances:

John B. Comegno, II, Esquire
Scott Jonathan Good
Comegno Law Group, P.C.
521 Pleasant Valley Ave.
Moorestown, New Jersey 08057

        Attorneys for Plaintiff

Amelia Carolla, Esquire
Reisman Carolla Gran LLP
19 Chestnut Street
Haddonfield, New Jersey 08033

        Attorney for Defendants

**BUMB**, UNITED STATES DISTRICT JUDGE:

        Plaintiff, the Moorestown Township Board of Education ("Moorestown" or the "District"), seeks judicial review of an administrative determination that it failed to offer M.D., a

1

child with learning disabilities, a free and appropriate public education ("FAPE") in violation of the Individuals with Disabilities Education Act ("IDEA" or the "Act"), 20 U.S.C. § 1400, et seq. M.D. was initially enrolled in public school in the Moorestown School District, where he received special education services under the Act. His parents subsequently moved him to a private school due to concerns that he was not making sufficient progress. After a year and a half at the private school, his parents asked Moorestown to evaluate M.D. and formulate an Individualized Education Plan ("IEP") for him, so they could determine whether Moorestown could provide him a FAPE. Moorestown refused to do the evaluations until M.D. re-enrolled in the District. M.D.'s parents, however, were unwilling to withdraw him from the private school for fear he would not only lose his spot there but also find himself without an appropriate education in the public school. Thus, the primary issue presented by this appeal is whether Moorestown had an obligation to provide an IEP to a privately enrolled child whom it had already found eligible for special education services and whom it knew resided in the District.

Currently before the Court are two motions for summary judgment: the first by Moorestown and the second by defendants S.D. and C.D., on behalf of their son, M.D. (collectively the "Defendants"). For the reasons set forth below, the Court

denies, in part, and grants, in part, both motions.[1]

## I. BACKGROUND

The following facts are undisputed.  M.D. lives with his parents, S.D. and C.D., in Moorestown, New Jersey.  He was born December 27, 1995, and was diagnosed with PDD-NOS, a form of autism, sensory integration dysfunction and Attention Hyperactivity Disorder in May 1999.  As a result of his disability, M.D. has received special education services from Moorestown since 1999.  During the 2005-2006 school year, while M.D. was a fourth grade student at Upper Elementary School in Moorestown, New Jersey, he was classified as "multiply disabled" and placed in a general education classroom with in-class supports and special literacy and math instruction.

On May 12, 2006, Defendants attended an IEP[2] team meeting for M.D. at Upper Elementary School to determine an appropriate program of services and placement for the 2006-07 school year. The IEP team proposed various changes to the IEP, and M.D.'s parents expressed concerns regarding the proposed levels of support and M.D.'s overall progress.  Accordingly, the IEP team agreed to re-evaluate M.D. in order to determine his current

---

[1] Additionally, the Court considers a third motion in which Moorestown sought leave to file an 81-page summary judgment brief, more than double the forty-page limit set by Local Rule 7.2(b).  [Dkt. Ent. 31.]  Moorestown filed this motion a mere three days before its dispositive motions were due on December 31, 2010.  Defendants opposed the motion, and Moorestown filed a reply on December 29, 2010.  The Court did not decide this motion before Moorestown filed a forty-page moving brief on December 31, in compliance with the Local Rules.  Accordingly, the Court denies this motion as moot.  In any event, such a lengthy brief was not appropriate under these circumstances.  The complexity of the facts and legal issues did not warrant such extensive briefing.

levels of functioning and to ensure that he was provided with an appropriate program and placement.

The IEP team reconvened on July 24, 2006, to review and update M.D.'s IEP, giving consideration to the data provided by the re-evaluation. The parties dispute the results of this meeting, specifically whether Defendants expressed dissatisfaction or concerns with the proposed IEP. This dispute is irrelevant for purposes of this appeal.

Shortly after the IEP team meeting, on August 23, 2006, Defendants notified Moorestown that they would be unilaterally placing M.D. at Orchard Friends School ("Orchard"), a private school located in Moorestown at the time,[3] for the 2006-07 school year. They requested reimbursement. Moorestown advised Defendants that M.D. could be properly accommodated in a less-restrictive placement and that it was not authorized to place students at Orchard, since it was not approved as a private school for the disabled by the New Jersey Department of Education.

M.D.'s parents nonetheless chose to enroll M.D. at Orchard. Defendants claim the District informed them that it was unable to place children at Orchard, even though this was untrue, because it was paying for another student to attend that school. Moorestown maintains that it informed Defendants that M.D. could only be placed at Orchard under a "Naples Placement," which

---

[2] An IEP is described in more detail <u>infra</u>.

requires the IEP team to consider nine lesser restrictive placements first.  Based on the District's alleged misrepresentation, M.D.'s parents notified Moorestown on August 31, 2006, that they had voluntarily decided to enroll M.D. at Orchard and that they would be fully responsible for tuition payments.

M.D. attended Orchard for the entire 2006-07 school year. During M.D.'s second year at Orchard, Defendants requested that Moorestown meet with them to discuss a proposed IEP so that they could determine whether to return to Moorestown or continue at Orchard.  Specifically, on December 13, 2007, Defendants, through their attorney, sent a letter to Barbara Fash, Director of Special Education at Moorestown.  The letter stated:

> I am writing to advise you that I have been retained to represent [M.D.] with regard to his education <u>within Moorestown School District.</u>
>
> [W]e are requesting that <u>the child study team conduct appropriate evaluations for [M.D.]</u>, who is currently attending Orchard Friends School, including: neuropsychological evaluation, speech and language assessment, learning assessment, assistive technology assessment and occupational therapy assessment.

C.D. Decl. Ex. G (Dkt. Ent. 34-24) (emphasis added).  Moorestown did not respond.

On January 17, 2008, Defendants' attorney sent a follow-up letter, which stated in relevant part:

> In light of the time deadlines imposed upon you by the law, I am asking that you contact us immediately so

---

[3] In September 2007, Orchard Friends School moved from Moorestown to a new location in Riverton, New Jersey.

> that the evaluations may begin.  If the District does
> not meet the necessary deadlines, we will have no
> choice but to file a complaint investigation with the
> State of New Jersey.

C.D. Decl. Ex. H (Dkt. Ent. 34-25).

On January 30, 2008, Defendants' attorney wrote a third letter to Ms. Fash.  This letter stated:

> On December 13, 2007, I wrote to you on behalf of
> [M.D.] to request numerous evaluations from Moorestown
> School District. I followed up with you on this request
> on January 17, 2008, but we still have heard nothing
> from you. The ninety days the school district has to
> complete the evaluations and develop and propose an IEP
> expires on March 12, 2008.
>
> The evaluations and IEP must be completed in a timely
> manner, if not, my clients will not be able to have a
> meaningful discussion about the District's proposed
> program before having to decide whether to continue
> [M.D.'s] placement at Orchard Friends School for this
> and next year. Please contact the parents immediately
> to arrange the necessary evaluations.

C.D. Decl. Ex. I (Dkt. Ent. 34-26) (emphasis added).

On January 31, 2008, counsel for Moorestown finally responded, advising Defendants that because M.D. was not enrolled as a student in the District, any request for "consideration of initial eligibility" under the IDEA should be directed to the Burlington County Educational Services Unit.  C.D. Decl. Ex. J (Dkt. Ent. 34-27).

On February 5, 2008, through their attorney, M.D.'s parents again wrote to the District and explained that the evaluations were being sought not for the purposes of providing M.D. with related services at Orchard, but instead to bring him back to the District if this was possible.  Specifically, the letter stated:

> The purpose of my writing on December 13th, January
> 17th, January 30th and again today is to request
> evaluations for this child to determine if Moorestown
> School District can offer him a program that complies
> with FAPE.  A referral to the Burlington County
> Educational Services Unit is inappropriate because we
> are not seeking the provision of services at Orchard
> Friends School by the Moorestown School District.

C.D. Decl. Ex. K.  Moorestown did not respond to this letter.  In

fact, Moorestown denies that it or its counsel ever received this

letter.

On September 3, 2008, M.D.'s parents filed a complaint for

due process, seeking reimbursement for M.D.'s 2006-07 school

year, on the grounds that the IEP Moorestown offered did not

provide a FAPE, and for the 2007-08 and 2008-09 school years

because the District failed to offer M.D. any IEP at all.  On

that same day, counsel for Moorestown sent a letter to M.D.'s

parents' attorney indicating that it would no longer transport

M.D. to Orchard Friends but would reimburse Defendants the

statutory cost to transport him pursuant to N.J. Stat. Ann. §

18A:39-1.  C.D. Decl. Ex. N.  The letter further stated, in

relevant part:

> [A]s discussed before at length, [Moorestown] is not
> required to re-evaluate M.D. for accommodations as he
> is not enrolled as [a] student of the Moorestown
> Township School District.  Since M.D. attends the
> Orchard Friends School, any request for consideration
> of eligibility under the Individuals with Disabilities
> in Education Act or N.J.A.C. 6A:14-1.1 *et seq.* or other
> special education or related services needs should be
> forwarded to the Burlington County Educational Services
> Unit.
>
> Alternatively, if your clients desire to have a child
> study team in [Moorestown] evaluate M.D. for special

<u>education and related services, they always have the
option of enrolling M.D. with the Moorestown Township
School District.</u>

C.D. Decl. Ex. N (emphasis added).

During the pendency of the due process hearing in 2009, both parties continued to dispute the prerequisites for M.D.'s IEP meeting with Moorestown:  the District insisted upon M.D.'s formal re-enrollment and even sent Defendants a registration packet.  Defendants refused to complete the registration packet, believing they were not obligated to re-enroll him, and fearing that if they did, he would lose his spot at Orchard and the District might not provide him a FAPE.[4] Meanwhile, M.D. remained at Orchard Friends School.

On May 10, 2009, Defendants filed an amended complaint for due process to add the 2009-10 school year.  On December 11, 2009, after eleven days of hearings, Administrative Law Judge Donald J. Stein (the "ALJ") issued a decision finding that Moorestown had offered M.D. a FAPE for the 2006-07 school year but had denied M.D. a FAPE by failing to convene an IEP team meeting, conduct evaluations, and develop an appropriate IEP for the 2007-08, 2008-09 and 2009-10 school years.[5]  Judge Stein held that M.D.'s parents were therefore entitled to unilaterally place

---

[4] Ms. Fash testified that the District would not allow a student to be enrolled in two places at once.  C.D. believed that the District might pursue truancy charges against her for enrolling M.D. in the District but not sending him.
[5] Although the Opinion refers to the 2006-07, 2007-08, and 2008-09 school years, the parties agree that Judge Stein meant to refer to the 2007-08, 2008-09, and 2009-10 school years.  The context of the Opinion supports the parties' position.  <u>See</u> ALJ Opn. 32-34, C.D. Decl. Ex. X, Dkt. Ent. 34-43.

M.D. in a private school at Moorestown's expense.  See ALJ Opn. 31-34.  Accordingly, he denied Defendants' claim for reimbursement of the 2006-07 school year but granted their claim for reimbursement of the remaining years.  Id.

On December 24, 2009, Moorestown filed a timely appeal of Judge Stein's decision in New Jersey Superior Court.[6]  Defendants thereafter removed the appeal to this Court.  On February 5, 2010, pending the resolution of the within appeal, the Court ordered Moorestown to make payments to Orchard Friends School on M.D.'s behalf as his pendent placement under the IDEA.  Dkt. Ent. 11.

On March 9, 2010, M.D.'s parents asked the District to provide them with an opportunity to view programs for M.D. for the 2010-11 school year.  In March and June, M.D.'s parents visited an autistic program at the District's high school, and on June 8, 2010, they attended an IEP meeting for M.D.'s programming for the 2010-11 year.  The team agreed that he would receive an appropriate education at the YALE-Cherry Hill School, an approved special education school for children with special needs, including autism.  M.D. began attending this program in September 2010 at the District's expense.

Both parties filed motions for summary judgment, which are now ripe for adjudication.

## II. JURISDICTION

---

[6] Any aggrieved party may appeal an ALJ's final decision through a civil

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(3)(A).

### III. LEGAL STANDARD

**A. Standard of Review under the IDEA**

Parents aggrieved by a local education agency's ("LEA's") decision regarding the provision of a FAPE are entitled to an impartial due process hearing, _see_ 20 U.S.C. § 1415(f)(1), and parties aggrieved by the administrative decision resulting from this hearing may file suit in federal district court, _see_ 20 U.S.C. § 1415(i)(2)(A).

The standard of review applied in an appeal of an administrative decision under the IDEA differs from the ordinary summary judgment standard. _See M.A. v. Voorhees Twp. Bd. Of Educ._, 202 F. Supp. 2d 345, 359 (D.N.J. 2002), _aff'd_, 65 Fed. Appx. 404 (3d Cir. 2003). In the Third Circuit, a district court applies a standard known as modified _de novo_ review. _See S.H. v. State Operated Sch. Dist. of the City of Newark_, 336 F.3d 260, 270 (3d Cir. 2003). Under this standard, the district court must give "due weight" and "deference" to the findings in the administrative proceedings. _D.S. v. Bayonne Bd. of Educ._, 602 F.3d 553, 564 (3d Cir. 2010); _Shore Reg'l High Sch. Bd. of Educ. v. P.S._, 381 F.3d 194, 199-200 (3d Cir. 2004). Factual findings are considered _prima facie_ correct, and if the reviewing court does not adhere to them, it must explain why. _Bayonne Bd. of_

---

action filed in state or federal court.  20 U.S.C. § 1415(i)(2).

Educ., 602 F.3d at 564.  When an ALJ has heard live testimony and made credibility determinations, his findings are given "special weight," and the Court must accept them unless extrinsic evidence in the record justifies a contrary conclusion.  Id. at 564.  The ALJ's legal determinations are reviewed de novo.  Muller v. Comm. on Special Educ., 145 F.3d 95, 102 (2d Cir. 1998); F.D. & S.D. v. Holland Twp. Bd. of Educ., Civ. No. 05-5237, 2007 WL 2021782, *4 (D.N.J. July 9, 2007); P.N. v. Greco, 282 F. Supp. 2d 221, 235 (D.N.J. 2003).  Applying these standards, the district court may make findings "based on the preponderance of the evidence and grant the relief it deems appropriate, including an award of attorney's fees, a requirement for reimbursement for a private educational placement, and a direction for the provision of a compensatory education."  Bayonne Bd. of Educ., 602 F.3d at 564 (citations omitted).

The party challenging an administrative decision bears the burden of persuasion and "faces the additional hurdle of overcoming a presumption that the Hearing Officer's findings were correct."  Andrew M. v. Delaware Cnty. Office of Mental Health & Mental Retardation, 490 F.3d 337, 345 (3d Cir. 2007); Hawkins v. Dist. of Columbia, 539 F. Supp. 2d 108, 112 (D.D.C. 2008) (citing Reid v. Dist. of Columbia, 401 F.3d 516, 521 (D.C. Cir. 2005)); Bd. of Educ. of Montgomery Cnty. v. Hunter, 84 F. Supp. 2d 702, 705 (D. Md. 2000) (citing Barnett v. Fairfax Cnty. Sch. Bd., 927 F.2d 146, 152 (4th Cir. 1991), cert. den'd, 502 U.S. 859 (1991)).

**B. Summary Judgment Standard**

Because this matter is pending before the Court on motions for summary judgment, the well-settled principles of summary judgment also apply. Hunter, 84 F. Supp. 2d at 705 n.2. Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." Id. at 250. When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." Meyer v. Riegel Products Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, "the mere existence of a scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Anderson, 477 U.S. at 249. In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "Summary judgment motions thus require judges to 'assess how one-sided evidence is, or what a 'fair-minded' jury could 'reasonably' decide.'" Williams v. Borough of West

12

Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989) (quoting Anderson, 477 U.S. at 265).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250 (internal citations and quotations omitted). The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995); see Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010), cert. den'd, 131 S. Ct. 458 (2010).

## IV. DISCUSSION

**A.   STATUTORY SCHEME**

**1. The IDEA**

Congress enacted the IDEA to ensure that all children with disabilities have available to them a free, appropriate public education. 20 U.S.C. § 1400(d)(1)(A). The Act operates through

the exercise of "cooperative federalism".  To receive federal
funding, states "must comply with federal requirements designed
to provide a [FAPE] for all disabled children." Shore Reg'l, 381
F.3d at 198 (citing 20 U.S.C. § 1412(a)(1)).  A FAPE is defined
as "special education and related services" that (1) are provided
at public expense, under public supervision and direction, and
without charge; (2) meet the standards of the State's educational
agency; (3) include an appropriate preschool, elementary or
secondary school education in the State; and (4) are provided in
conformity with the student's IEP.  20 U.S.C. § 1401(9).
Participating states provide a FAPE to a disabled child through
an individualized education plan, which is developed
collaboratively by the child's parents, teachers, and local
school officials.  Bd. of Educ. of Montgomery Cnty., 84 F. Supp.
2d at 705; 20 U.S.C. §§ 1414(d)(1)(A), 1401(14), 1412(a)(4).  The
IEP is the "centerpiece of the IDEA's system for delivering
education to disabled children." Bayonne Bd. of Educ., 602 F.3d
at 557 (citations and quotations omitted).  It includes a
specific statement of a student's present abilities, goals for
improvement, services designed to meet those goals, and a
timetable for reaching them.  Id.; 20 U.S.C. § 1414(d)(1)(A)(i).

## 2. New Jersey Public Schools

State and federal regulations set forth how the IDEA's
requirements are to be implemented.  New Jersey's regulations
regarding the development of an IEP follow the federal

14

requirements.  Bayonne Bd. of Educ., 602 F.3d at 557 n.1 (citing
State-Operated Sch. Dist. of Newark, 336 F.3d at 264).  The child
study team ("CST"), which is composed of a school psychologist,
learning disabilities teacher-consultant, and school social
worker, evaluates the child and determines his eligibility for
special education and related services.  See N.J. Admin. Code §
6A:14-3.1.  Within thirty days of this determination, the CST
must meet to develop an IEP.  See N.J. Admin. Code § 6A:14-3.7.
The IEP is reviewed at least once a year, see 20 U.S.C. §
1414(d)(4)(A)(i); N.J. Admin. Code § 6A:14-3.7(i), and the
child's eligibility for special education is reevaluated at least
once every three years, see 20 U.S.C. § 1414(a)(2)(B); N.J.
Admin. Code § 6A:14-3.8.

Public schools in New Jersey are free to persons over five
and under twenty years of age.  N.J. Stat. Ann. § 18A:38-1; N.J.
Admin. Code § 6A:22-3.1.  The domicile of the student, meaning
where the child's parents' permanent home is located, determines
the student's school district.  See N.J. Admin. Code § 6A:22-3.1
("A student . . . is eligible to attend school in a school
district if the student is domiciled within the district.").  A
school district may require documentation such as property tax
bills, deeds, voter registrations, and utility bills to
demonstrate a student's domicile, that is, eligibility for
enrollment in the school district.  N.J. Admin. Code § 6A:22-
3.4(a).

### 3.   "Child Find" Obligations

Public schools must do more than wait for an eligible disabled student to contact it.  The "Child Find" provision of the IDEA imposes an affirmative duty on states to locate, identify, and evaluate students with disabilities residing in their respective states.  See 20 U.S.C. § 1412(a)(3).  Accordingly, New Jersey regulations require each district board of education to ensure that "all students with disabilities" in the district, including those attending nonpublic schools, are located, identified, and evaluated.  N.J. Admin. Code § 6A:14-1.2(b)(3).

### 4.   Children enrolled in private schools by their parents

If a parent of a disabled child chooses to forego the public school services, the student is not entitled to the same level of service as a public school student.  The more limited services provided to parentally-placed children in private schools is commonly known as "equitable participation".  20 U.S.C. § 1412(a)(10)(A)(ii)(II).  Such children are entitled to some services from the district where the nonpublic school is located, and they are often provided at the private school or a private provider's service location.  See 20 U.S.C. § 1412(a)(10); 34 C.F.R. §§ 300.132, 300.137-139.  New Jersey has its own statutes and implementing regulations for the provision of these services.  See N.J. Stat. Ann. § 18A:46A, et seq., and N.J. Admin. Code § 6A:14-6.1. et seq.

**B.    THE APPEAL**

    **1.    Counts I-III: Moorestown's Obligation to Offer M.D. a FAPE[7]**

    The District's appeal focuses on the school years 2007-08, 2008-09, and 2009-2010.  As set forth above, Judge Stein found that because Moorestown denied Defendants' requests for an IEP for these years, it failed to offer M.D. a FAPE as required by law.

**a. Defendants' request for an IEP**

    Thus, the first question this Court must answer is whether Defendants asked Moorestown to evaluate M.D. and develop an IEP for him for the 2007-08 school year.  If the Court concludes that they did make such a request, it must then resolve the issue raised by Count One of the Complaint:  whether Moorestown had an obligation to evaluate and develop an IEP for M.D. even though he was not enrolled in the District.

    The record demonstrates, contrary to the District's position, that no genuine dispute exists as to whether M.D.'s parents requested evaluations and an IEP for the 2007-08 school year.  The Court must only resolve the "when."  The December 13, 2007, letter, in which Defendants' counsel requested that "the child study team conduct appropriate evaluations" of M.D., does not expressly request an IEP.  Moorestown avers that it did not

---

[7] Count I alleges that Moorestown is not obligated to offer FAPE to students who are not enrolled in the District.  Count II alleges that "after finding that the 'last' IEP, dated July 24, 2006, conferred FAPE, the Lower Court cannot find that Moorestown did not offer FAPE for subsequent years."  Count

receive the February 5, 2008, letter, which clearly spelled out M.D.'s desire to have an IEP meeting.  The January 30, 2008, letter, however, which Moorestown <u>did</u> receive, clearly requested evaluations and an IEP.  This letter explained that M.D.'s parents wanted a "meaningful discussion about the <u>district's proposed program before having to decide whether to continue [M.D.'s] placement at Orchard Friends School for this and next year.</u>"  C.D. Decl. Ex. I (emphasis added).  It further stated: "The ninety days the school district has to complete the evaluations and develop and <u>propose an IEP</u> expires on March 12, 2008."  <u>Id.</u> (emphasis added).  It was unmistakable from this January 30th letter that M.D. contemplated returning to the District and sought an IEP to determine whether Moorestown could offer him a FAPE.  The letter dated July 24, 2008, from M.D.'s attorney to counsel for Moorestown further stated M.D.'s position, <u>i.e.</u>, "to determine if Moorestown School District can offer him a program that complies with FAPE."  C.D. Decl. Ex. L.

### b. Moorestown's obligation to propose an IEP

Since M.D. did, in fact, request an IEP, the Court now turns to the heart of this appeal:  may a school district deny a request for evaluations and an IEP by a privately enrolled student whom the district knows is disabled and domiciled in district, on the ground that the student has not re-enrolled in the public school?

---

III alleges that Moorestown was not responsible for providing services once

18

The Court begins its analysis with the language of the IDEA. SimmsParris v. Countrywide Fin. Corp., -- F.3d --, 2011 WL 3196079, *3 (3d Cir. July 28, 2011); Hooks v. Clark Cnty. Sch. Dist., 228 F.3d 1036, 1040 (9th Cir. 2000). If the words are unambiguous, then judicial inquiry is complete. SimsParris, 2011 WL 3196079 at *3 (citing Conn. Nat'l Bank v. Germain, 502 U.S. 249, 254 (1992)). The Court must read particular provisions in the context of the full statutory scheme and apply a construction that will carry into execution the will of the Legislature. Id. (citing United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371 (1988); Kokoszka v. Belford, 471 U.S. 642, 650 (1974)).[8]

i. **_Statutory Language_**

The IDEA expressly requires states to make a FAPE "available to all children with disabilities residing in the State between the ages of 3 and 21 . . . ." 20 U.S.C. § 1412(a)(1)(A)(emphasis added); see also 34 C.F.R. § 300.101 ("A free appropriate public education must be available to all children residing in the State between the ages of 3 and 21 . . . .") (emphasis added). Neither this subsection nor the limiting provision immediately following

---

Riverton Township became the district of Orchard Friends' location.
[8] Moorestown argues that reading provisions of the IDEA and New Jersey regulations in the context of the whole statutory scheme will show that enrollment is the triggering event requiring a public school district to make FAPE available to students residing in its district. Pl.'s Reply Br. 4-6. As discussed infra, however, enrollment triggers timelines for when an LEA must fulfill certain obligations, i.e., after a child transfers from one district to another. An analysis of the statutory scheme actually indicates that children are entitled to a FAPE based on residency and where the parents request such services. See infra.

it restricts the state's obligation to only publicly enrolled children.  See 20 U.S.C. § 1412(a)(1)(B) (exempting states from FAPE obligations in certain circumstances based on child's age).

A second statutory provision in the Act requires each LEA to have in effect an IEP at the beginning of each school year for each disabled child "in the agency's jurisdiction."  20 U.S.C. § 1414(d)(2)(A) (emphasis added); see also 34 C.F.R. § 300.323(a). New Jersey has delegated this duty to the school district where the student is domiciled.  N.J. Admin. Code §§ 6A:22-3.1(a), 6A:14-1.1(d), 6A:14-1.3.  The statutory framework logically suggests that an LEA need not have in place an IEP for a child who has unilaterally enrolled in private school and thereby rejected the district's offer of a FAPE.  Compare 20 U.S.C. § 1412(a)(10)(B)(i) (providing IEPs to agency-placed privately enrolled children) with § 1412(a)(10)(A)(i) (providing equitable participation to parentally-placed students but not expressly discussing IEPs).  The federal implementing regulations support this interpretation.  See infra.  Compare 34 C.F.R. § 300.137-38 (discussing equitable services provided to parentally-placed private school child, such as a services plan) with § 300.146 (discussing state educational agency's responsibility of ensuring that agency-placed private school child is provided special education services in conformance with an IEP).

A third statutory provision requires an LEA to ensure that a reevaluation of "each child with a disability" is conducted if

20

<u>the child's parents request it</u>.  20 U.S.C. § 1414(a)(2)(A)(ii).

A limiting provision immediately following this subsection

provides for the frequency of such reevaluations, but does not

restrict the obligation to only publicly enrolled children.  20

U.S.C. § 1414(a)(2)(B).  Federal and state implementing

regulations echo this requirement.  <u>See</u> 34 C.F.R. § 300.303(a)(2)

("A public agency must ensure that a reevaluation of each child

with a disability is conducted . . . [i]f the child's parent . .

. requests a reevaluation."); N.J. Admin. Code § 6A:14-3.8(a)

("Reevaluation shall be conducted sooner [than every three years]

if . . . the student's parent . . . requests the reevaluation.").

Such reevaluations are used to determine the content of the

child's IEP.  20 U.S.C. § 1414(b)(2)(A)(ii).  In New Jersey, when

a reevaluation is completed, the student's IEP team must meet to

determine whether the student still has a disability and, if so,

"to review and revise" that IEP.  N.J. Admin. Code § 6A:14-

3.8(f)(2).

        Thus, the statutory language makes clear that where parents

request reevaluations of their child for purposes of having an

offer of a FAPE made for him, and the child is domiciled in the

district, the school district must comply.  An analysis of the

case law in this area supports such a construction, recognizing

that residency, rather than enrollment, triggers a district's

FAPE obligations.  In <u>James v. Upper Arlington School District</u>, a

case factually similar to this one, the parents withdrew their

learning disabled child from the public school system and placed him in a private school at their own expense.  228 F.3d 764, 766 (6th Cir. 2000), cert. den'd, 532 U.S. 995 (2001).  Subsequently, the parents requested that the district develop an IEP for him, but the district refused to provide him services until he re-enrolled.  Id. at 766.  The Sixth Circuit found that the "obligation to deal with a child in need of services, and to prepare an IEP, derives from residence in the district, not from enrollment."  Id. at 768.  The Court thus held that "refusing to do an IEP pre-enrollment constitutes" a violation of the Act.  It explained:

> To hold otherwise would allow the school to slough off any response to its duty until the parents either performed the futile act of enrolling their son for one day and then withdrawing him as soon as the IEP was complete, or, worse, leaving the child in an arguably inadequate program for a year just to re-establish his legal rights.  Neither action seems to be compelled by the statutory scheme or the case law.

Id. at 768 (internal citations omitted).  Although Moorestown attempts to distinguish James by arguing that Defendants did not request an IEP, the Court has already rejected this argument.  Several district courts have signaled their agreement with the Sixth Circuit's analysis.  See, e.g., Dist. of Columbia v. West, 699 F. Supp. 2d 273, 280 (D.D.C. 2010) (parents' due process claim was not frivolous for purposes of determining whether attorney's fees were warranted where district refused to evaluate child and develop IEP because she was not enrolled in public school); Hawkins v. Dist. of Columbia, 539 F. Supp. 2d 108, 115

(D.D.C. 2008) (school district had "fundamental obligation to provide FAPE to a child with a disability <u>residing in the District of Columbia</u>") (emphasis in original); <u>Dist. of Columbia v. Abramson</u>, 493 F. Supp. 2d 80, 85-86 (D.D.C. 2007) (school district's FAPE obligations extended to student attending private school in Connecticut, because he maintained his D.C. residency); <u>cf.</u> <u>Ms. K. v. Maine Sch. Admin. Dist.</u>, Civ. Action No. 06-42-P-H, 2006 WL 3081555, *14 n.5 (D. Me. Oct. 26, 2006) (rejecting argument that IDEA amendment relieved school district of all responsibility for developing IEP for student after her unilateral private school placement outside district).

Similarly, in <u>District of Columbia v. Abramson</u>, the court held that one district's Child Find obligations did not relieve the district of residence of its FAPE obligations.  There, the student attended a boarding school in Connecticut but wished to have his district of residence – the District of Columbia - propose an IEP for him.  493 F. Supp. 2d 80 (D.D.C. 2007).  The Court held that while "Connecticut may have child find responsibilities of its own," that fact did not exempt the D.C. school district "from having to fulfill its own responsibilities as the LEA of residence to evaluate the student and make FAPE available." <u>Id.</u>[9]

---

[9] The Court further notes that while the Supreme Court has not squarely addressed the issue on this appeal, its recent holding in <u>Forest Grove School District v. T.A.</u>, provides some support for the proposition that a district may not evade its FAPE obligations to a child residing in its district merely because he is enrolled in a private school.  129 S. Ct. 2484, 2489 & 2495 (2009).  There, the Court held that even though the student had not previously

Given the lack of ambiguity in the statute, judicial inquiry ends here.

### ii. *Congressional Intent*

Notwithstanding IDEA's plain language, the Court also notes that Moorestown's position is at odds with the "broad" mission of the Act to ensure that all children with disabilities receive an education that is both appropriate and free.  Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484, 2490-91 (2009); Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7, 13 (1993) ("IDEA was intended to ensure that children with disabilities receive an education that is both appropriate and free.").  The express purpose of the statute is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs" and to ensure that the rights of these children and their parents are protected.  20 U.S.C. § 1400(d)(1)(A-B).

If the Court were to adopt Moorestown's position, privately

---

received special education services from the public school, the district was still required to reimburse the student's private school tuition since it failed to provide a FAPE.  Id. at 2496.  Importantly, that student had already enrolled in the private school when he requested a FAPE from the district. The Supreme Court even acknowledged this fact, citing the dissenting Ninth Circuit opinion below, which argued that reimbursement was unavailable because the parents had not requested an IEP until after removing the student from public school.  Id. at 2490 ("In dissent, Judge Rymer stated her view that reimbursement is not available as an equitable remedy in this case because respondent's parents did not request an IEP before removing him from public school and respondent's right to a FAPE was therefore not at issue."). Further, the Court stressed that "when a child requires special-education services, a school district's failure to propose an IEP of any kind is at least as serious a violation of its responsibilities under IDEA as a failure to provide an adequate IEP."  Id. at 2491.

enrolled children with disabilities would not have available to
them a free, appropriate public education.  Parents would have to
enroll their child in public school with no information about the
type of program the district may offer, where the child may be
placed, or even if the district's IEP would constitute a FAPE.
The child would risk losing his place at the private school
without any guarantee that the district would provide an
appropriate education.  This presents a particularly troubling
scenario for parents who withdrew their child from public school
in the first place due to concerns that the district was not
providing a FAPE.  Should the parents take the risk, re-enroll
their child in the district and then find the public school
unable to provide him with a FAPE, the child may have lost his
place at the private school and must pursue relief through the
administrative review process.  As the Supreme Court has noted,
this process is "ponderous and therefore inadequate to ensure
that a school's failure to provide a FAPE is remedied with the
speed necessary to avoid detriment to the child's education."
Forest Grove, 129 S. Ct. at 2495 (citing Sch. Comm. of Burlington
v. Dep't of Educ. of Mass., 471 U.S. 359, 370 (1985)) (citations
omitted).  Surely, Congress did not intend to turn special
education into a game of poker, where a school district does not
have to show its cards until after the parents have taken the
gamble of enrolling their child, and the child bears the risk of
losing an appropriate education.  Thus, without the remedy

Defendants seek, a "child's right to a <u>free</u> appropriate education would be less than complete." <u>Cf.</u> <u>Forest Grove</u>, 129 S. Ct. at 2494-95.

Another court in this district applied similar reasoning in an analogous context:

> It would strain credulity to imagine that the legislature intended that . . . parents of a disabled child would enroll that child in a school without a program in place to deal with disabilities that the district has already diagnosed, particularly where, as here, the parents' disagreement with the previous IEP drove them to remove the child from the public school. Such parents would be faced with a Hobson's choice – enroll their disabled child in the public school in the hope that an appropriate IEP would be developed or enroll their child in a private school where they know what services will be provided to their child – but foot the entire bill themselves.

<u>A.Z. v. Mahwah Twp. Bd. of Educ.</u>, Civ. No. 04-4003, 2006 WL 827791, *6 (D.N.J. March 30, 2006). Although the child in <u>Mahwah Township</u> was enrolled in public school and services were withheld because he was not yet <u>attending</u> school, the Court's reasoning applies with equal force here. In fact, the <u>Mahwah</u> court clearly contemplated that "enrollment" should also not relieve a district of its IDEA obligations.

### iii. *The Federal Agency's Interpretation*

Notably, the federal agency charged with implementing the Act, the Office of Special Education and Rehabilitative Services ("OSERS") within the United States Department of Education, agrees with this Court's reading of the statute. In commentary to regulations implementing the 2006 IDEA Amendments, OSERS

stated that <u>unless parents express a clear intention</u> of keeping
their child enrolled in a private school or a school located
within another district, the school district <u>of residence</u> is
responsible for making a FAPE available to that child.  <u>See</u>
Assistance to States for the Educ. of Children with Disabilities
& Preschool Grants for Children with Disabilities, 71 Fed. Reg.
46540-01, 46593 (Aug. 14, 2006).[10]

Similarly, although OSERS does not recommend this practice,
it has also interpreted its regulations to permit a parent with a
privately enrolled child to request evaluations from both the LEA
where the child resides (for purposes of having a FAPE made
available to the child) and the LEA where the child is enrolled
(for equitable services) - here, Moorestown and Riverton, where
Orchard Friends is located.  <u>See</u> 71 Fed. Reg. 46540-01, 46593

---

[10] The relevant comment and discussion provides:

> Comment: Some commenters requested the regulations clarify which
> LEA (the LEA of residence or the LEA where the private elementary
> schools or secondary schools are located) is responsible for
> offering FAPE to children identified through child find under §
> 300.131 so that parents can make an informed decision regarding
> their children's education.

> Discussion: If a determination is made by the LEA where the
> private school is located that a child needs special education and
> related services, <u>the LEA where the child resides is responsible
> for making FAPE available to the child. If the parent makes clear
> his or her intention to keep the child enrolled in the private
> elementary school or secondary school located in another LEA, the
> LEA where the child resides need not make FAPE available to the
> child. We do not believe that a change to the regulations is
> necessary, as § 300.201 already clarifies that the district of
> residence is responsible for making FAPE available to the child.</u>
> Accordingly, the district in which the private elementary or
> secondary school is located is not responsible for making FAPE
> available to a child residing in another district.

71 Fed. Reg. 46540-01, 46593 (emphasis added). 34 C.F.R. § 300.201 states that
the LEA "in providing for the education of children with disabilities <u>within
its jurisdiction</u>, must have in effect policies, procedures, and programs that
are consistent with State policies and procedures established under §§ 300.101
through 300.163, and 300.165 through 300.174."  <u>Id.</u> (emphasis added).

27

(Aug. 14, 2006).[11]  Thus, according to OSERS, the regulations contemplate that, upon the parents' request, a school district must evaluate a disabled child residing in its district for purposes of making a FAPE available to him, even if he is enrolled in a private school in another district.  Id.  These statements were both published with the final regulations in the Federal Register.

The Court's own research also revealed that OSERS provided commentary to its earlier, 1999 regulations, which is germane to this issue.  There, it considered whether a public agency must evaluate and develop an IEP for a privately enrolled child in order to avoid potential reimbursement claims.  The agency responded that LEAs need not perform new evaluations for each privately enrolled child each year, but laid out, inter alia,

---

[11] The comment and discussion provide in relevant part:

> Comment: One commenter expressed concern that the regulations permit a parent to request an evaluation from the LEA of residence at the same time the child is being evaluated by the LEA where the private elementary school or secondary school is located, resulting in two LEAs simultaneously conducting evaluations of the same child.

> Discussion: We recognize that there could be times when parents request that their parentally-placed child be evaluated by different LEAs if the child is attending a private school that is not in the LEA in which they reside. For example, because most States generally allocate the responsibility for making FAPE available to the LEA in which the child's parents reside, and that could be a different LEA from the LEA in which the child's private school is located, parents could ask two different LEAs to evaluate their child for different purposes at the same time. Although there is nothing in this part that would prohibit parents from requesting that their child be evaluated by the LEA responsible for FAPE for purposes of having a program of FAPE made available to the child at the same time that the parents have requested that the LEA where the private school is located evaluate their child for purposes of considering the child for equitable services, we do not encourage this practice. . . .

Id.

three separate situations in which LEAs must evaluate and develop

an IEP:

> (1)  Where the child is enrolled in public school;
>
> (2)  Where the child is enrolled in private school <u>and the parents request reevaluations</u> pursuant to 34 C.F.R. § 300.536; or
>
> (3)  Where the privately enrolled child re-enrolls in public school.

64 Fed. Reg. 12406-01, 12601 (Mar. 12, 1999).[12]  Thus, according

to the 1999 commentary, a school district must reevaluate a

privately enrolled student in its jurisdiction and review his IEP

---

[11] The entire comment and discussion states:

> Comment: One commenter requested that the regulations clearly state whether a public agency must evaluate and develop an IEP for each private school child with a disability each year in order to avoid potential reimbursement claims.
>
> Discussion: The new statutory provisions, incorporated in the regulations in § 300.403 (c), (d), and (e), provide that, as a general matter for children with disabilities who previously received special education and related services under the authority of a public agency, the claim for reimbursement of a private placement must be made before a child is removed from a public agency placement. It would not be necessary for a public agency to develop an IEP that assumes a public agency placement for each private school child each year. LEAs do have ongoing, independent responsibilities under the child find provisions of §§300.125 and 300.451 to locate, identify and evaluate all children with disabilities in their jurisdiction, including children whose parents place them in private schools. This would include scheduling and holding a meeting to discuss with parents who have consented to an evaluation, the results of the evaluation, the child's needs, and whether the child is eligible under Part B. (See §§300.320, and 300.530-300.535.)
>
> In addition, the LEA must offer to make FAPE available if the child is enrolled in public school. A new evaluation need not be performed for each private school child each year, <u>but evaluations for each private school child must meet the same evaluation requirements as for children in public agency placements, including the requirement for reevaluation in §300.536. In addition, since LEAs must make FAPE available to all children with disabilities in their jurisdiction</u> (§§300.121, 300.300), public agencies must be prepared to develop an IEP and to provide FAPE to a private school child if the child's parents re-enroll the child in public school.

64 Fed. Reg. 12406-01, 12601 (1999) (emphasis added).

if the parent requests it.[13]  34 C.F.R. § 300.536 (1999).  It
follows, then, that the district must also <u>revise</u> the IEP at the
parent's request, thereby offering the privately enrolled child a
FAPE.  This interpretation is supported by the New Jersey
implementing regulations, which require an IEP team following a
reevaluation to review and <u>revise</u> the IEP, assuming the child is
still disabled.  N.J. Admin. Code § 6A:14-3.8(f).  It also
comports with another portion of the 1999 commentary, which
stresses that an LEA must make a FAPE available to all children
with disabilities in its jurisdiction.  64 Fed. Reg. at 12601.
As discussed above, a school district in New Jersey has
jurisdiction over all students domiciled in that district.  <u>See</u>,
<u>supra</u>, Part IV.B.1.b.i.

The 2006 commentary also reflects that an LEA's obligation
to develop an IEP for a student does not simply depend on the
enrollment status of the child in public school but also on the
parents' wishes and the child's residency.  The more recent OSERS
commentary contemplates that, at the parent's request, a school
district must evaluate a student for purposes of making a FAPE
available to him even if he is attending a private school in

---

[13] The 1999 version of 34 C.F.R. § 300.536, entitled "Reevaluation", provided:
Each public agency shall ensure –
    (a) <u>That the IEP of each child with a disability is reviewed</u> in
        accordance with §§ 300.340-300.350; and
    (b) That a reevaluation of each child, in accordance with §§
        300.532-300.535, is conducted if conditions warrant a
        reevaluation, <u>or if the child's parent or teacher requests a</u>
        <u>reevaluation</u>, but at least once every three years.
<u>Id.</u>  Subsequent to the 2006 amendments, a modified version of this regulation
is now found at § 300.303.

another district.  Reading the 2006 commentary with the 1999
commentary, the Court interprets OSERS' guidance to mean that
where parents either re-enroll their child in public school or
request evaluations so they can re-enroll him, the district must
evaluate and develop an IEP for that child for purposes of
proposing a FAPE.  See L.G. v. Wissahickon Sch. Dist., Civ. Nos.
06-0333, 06-3816, 2011 WL 13572, *11 n.9 (E.D. Pa. Jan. 4, 2011)
(district was not required to continue developing IEP after
parents withdrew child from public school, but this obligation
resumed when child's parents notified district that child "would
re-enroll") (citing 64 Fed. Reg. at 12601).

When an agency interprets its own regulations, a very
deferential standard applies; such an interpretation is
"controlling unless plainly erroneous or inconsistent with the
regulation."  Fed. Express Corp. v. Holowecki, 552 U.S. 389, 397
(2008) ("Just as we defer to an agency's reasonable
interpretations of the statute when it issues regulations in the
first instance, see Chevron, the agency is entitled to further
deference when it adopts a reasonable interpretation of
regulations it has put in force."); Auer v. Robbins, 519 U.S.
452, 461 (1997); Rupert v. PPG Indus., Inc., Civ. Action Nos. 07-
705, 08-616, 2009 WL 596014, *41 n.5 (W.D. Pa. Feb. 26, 2009)
(applying Auer deference to federal agency's commentary, which
explained final rule and was published with rule in Federal
Register).  Since the above commentary comports with the agency's

31

regulations, the Court adopts OSERS' interpretation.

### iv. Moorestown's Arguments

Moorestown relies upon various provisions of the IDEA, which the Court finds inapplicable to this matter.  First, Moorestown cites to 20 U.S.C. § 1414(a)(1)(C)(ii)(I), which permits a parent and the LEA to agree to longer than sixty days to conduct initial evaluations, _if_ the child enrolls in a school _after_ the sixty-day time frame has begun and prior to a determination that the child is qualified as disabled.  This provision addresses the LEA's obligation to a child who either has not yet been classified as disabled or who has already transferred to a new school.  Thus, it has no application here, where M.D. had already been classified as disabled and the parents requested an IEP _in the hopes_ of transferring him back to the district.  Similarly, New Jersey implementing regulations dealing with timelines for when a disabled student transfers from one district to another are irrelevant in this context.  Pl.'s Moving Br. 7-9 (citing §§ 6A:14-4.1(g) and 6A:14-4.1(m)).

Moorestown also argues that it provided "equitable participation" to M.D. in compliance with 20 U.S.C. § 1412(a)(10).  This fact is irrelevant, however, since M.D. was not seeking such additional services.  As the record shows, M.D.'s parents were requesting an IEP meeting, not evaluations for equitable services, which M.D. was already receiving. Moorestown did not satisfy its FAPE obligations to M.D. by

32

referring him to Burlington County Educational Services Unit ("Burlington County ESU"), which Moorestown had contracted to perform its initial evaluations of students enrolled in non-public schools pursuant to its Child Find obligations.  Pl.'s Moving Br. 17.  M.D. was not seeking an initial evaluation or additional services at Orchard, but an IEP so that he could potentially transfer back to the District.  Moorestown's response to the Defendants' requests, referring them to the Burlington County ESU, is particularly troubling because the District already knew M.D. was eligible for special education services. See, supra, Part I (citing Letter from John B. Comegno, II, Esq., counsel for Moorestown, to Amelia Carolla, Esq., counsel for Defendants (Jan. 31, 2008) (C.D. Decl. Ex. J, Dkt. Ent. 34-27).

Moorestown's heavy reliance upon the non-binding "Frequently Asked Questions" on the New Jersey Department of Education's ("NJDE's") website illustrates the weakness of its position. There, the NJDE states:

> If the child is eligible for special education and
> related services, the public school district must make
> a free, appropriate public education available only if
> the child enrolls in the district.

Frequently Asked Questions: Homeschooling ("FAQ's") at Question 10, N.J. Dep't of Educ., http://www.nj.gov/education/genfo/faq/faq_homeschool.htm (last visited Sept. 14, 2011).  Moorestown argues that while the NJDE's interpretation of the IDEA is not binding authority, it is an interpretive rule entitled to deference by this Court.  Pl.'s

Reply Br. 6.

Unlike legislative rules, which are promulgated pursuant to notice and comment procedures and have substantive legal effects by creating new law, interpretive rules are issued without exercising such delegated legislative power.  State of N.J. v. Dept. of Health & Human Servs., 670 F.2d 1262, 1281 (3d Cir. 1981), see also Dia Nav. Co., Ltd. v. Pomeroy, 34 F.3d 1255, 1264 (3d Cir. 1994).  Rather, they are "statement[s] made by an agency to give guidance to its staff and affected parties as to how the agency intends to administer a statute or regulation."  State of N.J., 670 F.2d at 1281-82 (citations omitted).  While courts must defer to an agency's reasonable legislative rules under the Supreme Court's decision in Chevron, courts need not give such deference to interpretive rules.  Cleary v. Waldman, 167 F.3d 801, 807-808 (3d Cir. 1999), cert. den'd, 528 U.S. 870 (1999) (citing Chevron USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984)).  The Third Circuit clarified the degree of deference due to such interpretive rules in Cleary, 167 F.3d at 807-808:

> [W]here an administrative agency's interpretation is registered in informal views, as long as that agency has a delegated authority to administer the statute and the views are made "in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge", then those views warrant some deference. . . .  How much guidance and weight depends, however, on the "thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if

34

lacking power to control." . . .

[An interpretive rule] will be given deference as long as it is consistent with other agency pronouncements and furthers the purposes of the Act.

Id. (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

It is unclear that an answer to an FAQ on NJDE's website even amounts to an interpretive rule, since the webpage provides the disclaimer that the FAQ's are not "legal advice or state directives."   Frequently Asked Questions: Homeschooling ("FAQ's") at Question 10, N.J. Dep't of Educ., http://www.nj.gov/education/genfo/faq/faq_homeschool.htm. Nevertheless, even assuming the FAQ does constitute an interpretive rule, Moorestown has not explained the type of investigations, if any, which led to its drafting, the regulations that it purports to interpret, or the grounds for its interpretation in the statutory and regulatory text.   Thus, the Court has no basis to determine the thoroughness of the agency's consideration or the validity of its reasoning.   These concerns militate against giving deference to the FAQ.

Even if the Court owed this "rule" deference, the FAQ does not support the broadness of Plaintiff's position.   First, it is likely that the FAQ contemplates a distinction between proposing an IEP for a student, which M.D.'s parents requested here, and actually making FAPE available to him after enrollment.

Second, the FAQ does not state that a public school district may refuse to offer an IEP to a student, where the district is

35

aware that the student <u>resides in the district and would like to</u> <u>enroll</u> if offered a FAPE.  The requirement that the child "enroll" is more likely a place-holder for establishing residency, which triggers the LEA's duties under the Act.  In New Jersey, the process of enrollment is a mere a mechanism to establish residency and is not a strict barrier to attend school. Indeed, New Jersey regulations allow enrollment in public school even when the student's residency is questionable, and the student's eligibility thus in doubt.  A student must satisfy any questions by the school or face removal only <u>after</u> enrollment. <u>See</u> N.J. Admin. Code § 6A:22-4.1(c)(1) ("Where an applicant has provided . . . questionable information, enrollment shall take place immediately, but the applicant shall be placed on notice that removal will result if defects in the application are not corrected . . . .").  Surely, if a student whose residency is in doubt, is nonetheless deemed "enrolled" in the school pending resolution of the residency issue, then a disabled student, whose residency is <u>not</u> in question, should also be deemed "enrolled" for purposes of requesting a FAPE.  Enrollment should therefore not bar eligibility for a FAPE where a child's residency is not in question.

In any event, to the extent that the FAQ calls for a rigid requirement, which would allow a school district to evade its obligation to provide an IEP for a child because he is not enrolled in that district, the Court will not defer to such an

interpretation. It would clearly contravene the language and purpose of the Act and other agency pronouncements. See supra. Permitting such a reading would lead to the untenable conclusion that New Jersey's regulations limit the statutory mandate they purport to implement.

Moorestown also argues that because M.D. withdrew from the District, the school could not have known to revise an appropriate IEP for him. Pl.'s Moving Br. 15. This argument is clearly without merit. The Court has already found that, at the latest, the Defendants' January 30, 2008, letter put Moorestown on notice of their request for evaluations and an IEP.

Next, Moorestown argues that it was not required to develop an IEP for M.D. when his parents requested it, because they had not contested his proposed 2006-07 IEP. See Compl. Count II; Pl.'s Moving Br. 18. Moorestown relies on Tracy v. Beaufort County Board of Education for the proposition that "a school district is only required to continue developing IEPs for a disabled child no longer attending its school when a prior year's IEP for the child is under administrative or judicial review." 335 F. Supp. 2d 675, 691 (D.S.C. 2004) (citing M.M. v. Sch. Dist. of Greenville Cnty., 303 F.3d 523, 536-37 (4th Cir. 2002)). This reliance is misplaced. Unlike the parents in Tracy, here, the Defendants repeatedly asked for IEP evaluations because they hoped to re-enroll M.D. with the district. As discussed above, the statutory scheme indicates that while a district need not

continue developing IEPs for a child who has unilaterally withdrawn from the public school, if the parents request evaluations because they would like to re-enroll him in the district, the district's obligation to develop a new IEP is renewed.

Moorestown also argues that it was not responsible for providing services to M.D. once Orchard relocated to Riverton Township, because the district where the private school is located has the duty to provide equitable participation to the child.  Pl.'s Moving Br. 22 (citing N.J. Admin. Code 6A:14-6.2); Compl. Count III.  Notably, however, Moorestown does not argue that Riverton was required to offer M.D. a FAPE.  Pl.'s Opp. Br. 27.  As the Court has already discussed, Defendants were not requesting evaluations or services related to equitable participation.  They requested evaluations and an IEP so they could determine whether Moorestown could offer M.D. a FAPE. Thus, it is of no relevance that Riverton had an obligation to make equitable services available to him.

In the final analysis, Moorestown shucks the word "enroll" from inapplicable statutory and regulatory provisions to make its case.  Such sophism is troubling.  Since M.D.'s disabled status and residency were known to the District, Moorestown's requirement that he enroll in the public school before he would be considered for special education services served no purpose other than to circumscribe the District's IDEA obligations and

create a barrier to the provision of a FAPE.  Such unnecessary procedural hurdles frustrate IDEA's broad, remedial purpose.  They become even more indefensible when they put children and their parents in "Zugzwang".[14]  Clearly, Congress intended collaboration, not gamesmanship.  Cf. A.Z v. Mahwah Twp. Bd. of Educ., Civ. No. 04-4003, 2006 WL 827791, *6 (D.N.J. Mar. 30, 2006) ("It would strain credulity to imagine that the legislature intended that [] parents of a disabled child would enroll that child in a school without a program in place to deal with disabilities that the district has already diagnosed . . . ."); Ms. K. v. Maine Sch. Admin. Dist., Civ. Action No. 06-42-P-H, 2006 WL 3081555, *14 n.5 (D. Me. Oct. 26, 2006) ("I cannot stress forcefully enough my opinion that the District's use of [IDEA] amendments as some kind of trap door through which to jettison a special education child who is parentally placed in a private school because of parental dissatisfaction with the IEP subverts, utterly, the most basic objective of [IDEA].").

Moorestown, as the school district of M.D.'s residence, was responsible for providing him a FAPE.  In erecting an artificial barrier, Moorestown shirked its responsibilities under the Act.  Its actions are particularly troubling here, where school officials believed M.D.'s placement at Orchard was inappropriate given his disabilities.  See, supra, Part I.  Since the District failed to respond to Defendants' repeated requests for

---

[14] Zugzwang is the unenviable position in chess where "a player is obliged to

evaluations and an IEP, the Court affirms Judge Stein's finding
that Moorestown failed to offer M.D. a FAPE for the 2007-08,
2008-09, and 2009-10 school years.  See Forest Grove Sch. Dist.
v. T.A., 129 S. Ct. 2484 (2009) (school district denied student a
FAPE by declining to offer him an IEP).

   **2.   Count IV: Appropriateness of M.D.'s Placement at
          Orchard Friends School**

   Count IV of the Complaint alleges that M.D.'s placement at
Orchard was not appropriate, and thus Defendants are not entitled
to tuition reimbursement.  It is well-settled that when a school
district receiving IDEA funding fails to provide a FAPE, the
parents may seek tuition reimbursement.  Florence Cnty. Sch.
Dist. Four v. Carter, 510 U.S. 7, 12 (1993).  However, such
reimbursement is only permitted if the private placement was
appropriate.  Forest Grove, 129 S. Ct. at 2487-88; Sch. Comm. of
Burlington v. Dept. of Educ., 471 U.S. 359, 369-70 (1985); Mary
T. v. Sch. Dist. of Philadelphia, 575 F.3d 235, 242 (3d Cir.
2009).  Since the Court has already concluded that Moorestown
denied M.D. a FAPE, the Court, now turns to the second issue, the
appropriateness of M.D.'s placement at Orchard.  The Supreme
Court has held that a private school placement is proper under
the Act if it is "reasonably calculated to enable the child to
receive educational benefits."  Florence, 510 U.S. at 11
(citations and quotations omitted).  The parents' alternative

---

move but cannot do so without disadvantage." 3 Oxford English Dict. 1400
(1987).

placement need not meet the criteria of a FAPE, see id. at 13;
Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 364 (2d Cir.
2006); F.D. v. Holland Twp. Bd of Educ., Civ. No. 05-5237, 2007
WL 2021782, *5 (D.N.J. July 9, 2007).  It also need not be
"perfect", only appropriate.  Warren G. v. Cumberland Cnty Sch.
Dist., 190 F.3d 80, 84 (3d Cir. 1999); F.D., 2007 WL 2021782 at
*5.

     The ALJ found that M.D.'s parents "diligently searched all
available options for their son and chose Orchards."  ALJ Opn. at
28, Defs.' Ex. X, Dkt. Ent. 34-43.  Judge Stein noted that M.D.'s
mother, his occupational therapist, the head of Orchard, and a
neuropsychologist, described M.D.'s program at length, and all
felt it was an appropriate placement for him.  Finding that the
District had not offered any testimony or expert opinion to the
contrary, Judge Stein determined that Orchard was an appropriate
program and that M.D. had "done very well there."  Id. at 28-29.

     Moorestown argues that Judge Stein erred in finding Orchard
an appropriate placement.  First, the District points to the fact
that the New Jersey Department of Education did not approve it.
Pl.'s Moving Br. 25.  The Supreme Court has unanimously rejected
this very argument, holding that reimbursement may be appropriate
even when a child is placed in a private school that has not been
approved by the State.  See Florence, 510 U.S. at 14 (explaining
that it "hardly seems consistent with the Act's goals to forbid
parents from educating their child at a school that provides an

41

appropriate education simply because that school lacks the stamp
of approval of the same public school system that failed to meet
the child's needs in the first place").

Second, Moorestown improperly attempts to impose a FAPE
requirement by arguing that Orchard was not the least restrictive
environment.  As already discussed, a parent's alternative
placement need not meet the demands of a FAPE; it need only be
reasonably calculated to provide an educational benefit.

Third, Moorestown contends that Orchard did not have
appropriate staffing, that M.D. did not receive individualized
instruction, and that he did not make meaningful progress there.
Turning to the staffing issue, the Court finds no merit to the
District's argument that Orchard is not appropriate because it
does not directly employ guidance counselors, a medical doctor, a
nurse, a school psychologist or a psychiatrist.  Moorestown has
not cited to any evidence, testimony or otherwise, showing that
M.D. needed any of these professionals, as direct and daily
employees of the school, in order to benefit from his education
at Orchard.

Further, the testimony and documents entered into evidence
at the administrative hearing support the ALJ's finding that M.D.
did receive educational benefits from his placement at Orchard.
For example, M.D.'s mother believed M.D. consistently made
progress since attending Orchard.  Before his placement in 2006,
she would try to read a book like Jigsaw Jones (grade level 1-3)

with M.D., and it would take him 20 minutes to read one page. When she testified in 2009, he was on the fifth book in the Harry Potter series (grade level 5-7).  See Transcript ("Tr.") 131:4-14, Sept. 10, 2009, Carolla Decl. Ex. L, Dkt. Ent. 34-16.

Dr. LeGoff testified without objection from the District as an independent neuropsychologist in treating and planning education for children with autism.  See Tr. 5:21-6:11, Aug. 6, 2009.  He stated that he first met M.D. in 2004, when he conducted intelligence and achievement testing.  Id. at 9:12-21. He visited M.D. after his placement in 2008 at Orchard and saw that his previously high level of stress and anxiety was noticeably absent; M.D. was interacting with other students and had improved his communication style with a reduction in halted speech. Id. at 26-28.  Dr. LeGoff testified that M.D. benefitted from his time at Orchard and credited its use of hands-on, experiential learning techniques and peer directed learning (where children teach each other and work cooperatively).  Id. at 34-36.  According to Dr. LeGoff, M.D. also benefitted from Orchard's small school setting and the fact that its staff were clearly experienced in teaching children with mixed learning and social communication difficulties.  Id. at 37-40.  Dr. LeGoff testified that when he evaluated M.D. in 2008, using achievement and intelligence testing, he observed an objective level of improvement in M.D.'s scores.  Id. at 40-48.  He also stated that M.D. had made academic progress and had reduced idiosyncratic

43

behaviors and scripting.  Id. at 57-58.  In light of M.D.'s
progress, Dr. LeGoff found "considerable justification for
continuing his current programming."  Id. at 48.

Donna Goud, the head of Orchard, also testified as an expert
in teaching children with special needs, having done so for more
than 28 years.  See Tr. 87-88, July 24, 2009.  Ms. Goud testified
that since Orchard only takes 30 children per year, she saw M.D.
five or six times, nearly every day, for three years.  Id. at 51-
52.  According to her, he benefitted from his time at Orchard,
having developed his social skills, reduced his anxiety level,
and improved his ability to handle transitions and self-advocate.
Id. at 60-63, 73-74.  Ms. Goud testified that when M.D. first
attended Orchard, he participated in the school's talent show but
needed to have his typically-developing sister on stage with him
to feel comfortable.  She stated that by the third year, he was
on stage by himself in front of more than 100 people.  Id. at 74-
75.  According to Ms. Goud, Orchard develops IEPs for its
students with input from teachers and parents.  Id. at 77-79.  In
her opinion, using the same programs that public schools use for
academics with modifications, M.D. made progress.  Id. at 91-92.

Judge Stein also accepted Dawnylle Cerula, M.D.'s certified
speech therapist at Orchard, as an expert in speech therapy.  See
Tr. 10, July 30, 2009.  Ms. Cerula testified that when she met
M.D. in 2006, she immediately noticed expressive and receptive
language delays, auditory processing difficulties and huge social

44

skills deficits.  Id. at 11.  She stated that "he was a very
anxious little boy and didn't handle stress well at all," making
it difficult for him to focus on his learning.  Id. at 13-14.
She testified that she tested him soon after he arrived and
determined his speech, language and social skills goals based on
this testing.  Id. at 15.  In her opinion and according to her
objective testing, M.D. "absolutely" made progress in his speech
goals and social skills goals every year he was at Orchard.  Id.
at 44-45, 54-55, 61.

Andrea Tyszka, M.D.'s occupational therapist, testified as
an expert in the field of providing occupational therapy to
children with autism.  See Tr. 27, July 21, 2009.  She testified
that when she first met M.D. in 2006, she immediately noticed
that he had significant anxiety, challenges with sensory
processing, maintaining his attention, and social interaction
with peers.  Id. at 49.  According to Ms. Tyszka, she assessed
M.D., found him in need of occupational therapy, and developed a
program for him at school.  Id. at 53.  She testified that she
worked with him for three years and saw improvement in his social
skills as well as his ability to self-regulate his sensory needs
and manage his anxiety.  Id. at 72-73.  According to Ms. Tyszka,
during one exercise, another student labeled M.D. his "best
friend," which for a child with autism is "pretty incredible."
Id. at 73.  In her opinion, M.D. "absolutely" received an
educational benefit from being at Orchard Friends.  Id. at 74.

Thus, no less than four experts, who were all accepted by the ALJ and knew M.D. for more than three years, testified that they believed M.D.'s placement was appropriate and that he received an educational benefit from his time at Orchard. Notably, only one of the District's testifying witnesses, a speech therapist, had even seen M.D. since 2006, and this was for a mere three-hour meeting, during which she evaluated M.D.  See Tr. 106, July 24, 2009.  That witness, Tracy Roberts, had never worked with or even met M.D. before, and she had not reviewed any documents from Orchard prior to this evaluation, including his speech or testing records.  See id. at 106-08, 114.  According to Ms. Roberts, her testing revealed that M.D. still had significant needs in speech and language, but she also noted that this was typical for autistic children and did not necessarily mean that he had not made progress. Id. at 109-10.  She also testified that M.D.'s scores showed improvements in many areas.  Id. at 115-18.

Moorestown relies on the testimony of school psychologist Tahira Aziz.  However, Ms. Aziz testified that she had not seen M.D. since 2006 when he was with the District.  Tr. 98, May 11, 2009.  Because of this, she could not dispute Dr. LeGoff's testimony and report showing that M.D. had improved focus, social skills, coping skills, and reduced idiosyncratic behaviors. Id. at 109.  She also testified that she could not dispute that M.D. had received a meaningful benefit from placement at Orchard or that he had made gains in the area of auditory comprehension and

46

language-based reasoning and processing abilities.  Id. at 110.

In light of this extensive record, the Court finds no reason to disturb Judge Stein's finding that M.D.'s placement at Orchard Friends was appropriate under the IDEA.

### 3.   Count V: Additional Evidence

Moorestown also argues that the ALJ erred by barring it from presenting testimony concerning the regulatory process at issue here.  Pl.'s Moving Br. 30.  The ALJ excluded this testimony as improper legal opinion.  After filing this appeal, Moorestown moved to expand the record to include the testimony excluded below.  This Court denied Moorestown's motion without prejudice, finding that (1) Moorestown had failed to show how such testimony related to any fact at issue in the case, and (2) Moorestown had given only a vague and broad description of the proffered evidence[15] – i.e., requesting the admission of unnamed witnesses to provide such testimony "as may be necessary".  Moorestown Twp. Bd. of Educ. v. S.D., Civ. No. 10-312, slip op. at 12-14 (D.N.J. Oct. 15, 2010), Dkt. Ent. 27 ("Slip. Op.").  This Court also came to the same conclusion as Judge Stein, that Moorestown sought to introduce testimony that amounted to legal analysis or statutory interpretation, rather than actual evidence.  However, the Court

---

[15] In its motion to expand the record, Plaintiff sought to include the following additional evidence:  (1) testimony detailing the regulatory process for the provision of services to students enrolled in non-public schools, and the services provided to those students, (2) testimony as to whether the Board complied with the regulatory system developed by the New Jersey Department of Education for the provision of services to students enrolled in non-public or private schools, and (3) testimony as to whether the system developed by the New Jersey Department of Education is consistent with federal law.

permitted the District to proffer additional evidence at the time of summary judgment to the extent that it believed it was precluded from making its legal argument without such evidence.

In its summary judgment papers, Moorestown argued again that the ALJ erred by barring it from presenting such testimony. Notably, Plaintiff once again failed to specify its anticipated witnesses and the testimony they would likely provide.  Plaintiff did set forth, however, the purpose of the additional testimony:

> (i) [To] explain[] the regulatory system established by the IDEA and the New Jersey Department of Education and the provision of equitable services versus services provided to enrolled students; (ii) how the New Jersey Department of Education implements the regulations established by the IDEA; and (iii) the role and function of the New Jersey Department of Education in educating the administration of local education agencies as to the appropriate methods of implementing these regulations.

Id. at 32-33.  Moorestown explained that such testimony would have assisted the ALJ in "understanding the pivotal issue at trial, namely, whether non-enrolled, privately placed students are entitled to the same services as students enrolled in the District."  Id. at 32.  After Defendants opposed this motion, Moorestown apparently abandoned this argument in its reply papers.  Nevertheless, the Court notes that Moorestown essentially restated the argument made in its motion to expand the record, which this Court previously denied.  The Court now denies this motion for similar reasons.

The Third Circuit recently clarified that expert testimony on legal rules and regulations may be permitted in certain

circumstances where the testimony pertains to a factual dispute at issue in the trial.  <u>See</u> <u>United States v. Fumo</u>, -- F.3d --, 2011 WL 3672774, *10-11 (3d Cir. Aug. 23, 2011).

> "[W]hile it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury, our Court has allowed expert testimony concerning business customs and practices." <u>United States v. Leo</u>, 941 F.2d 181, 196 (3d Cir. 1991).  These customs and practices will sometimes include applicable legal regulations, such as registration requirements for securities registration under the Securities Acts, <u>Berckeley Inv. Grp., Ltd. V. Colkitt</u>, 455 F.3d 195, 218-19 (3d Cir. 2006), or Medicaid rules, <u>United States v. Davis</u>, 471 F.3d 783, 789 (7th Cir. 2006).  Similarly, expert testimony may also concern ethics rules and laws related to public officials and government contractors.

<u>Fumo</u>, 2011 WL 3672774 at *10.  In <u>Fumo</u>, a jury convicted a former state senator of fraud, tax evasion and obstruction of justice. On appeal, Fumo argued that the district court had improperly permitted evidence on the state Ethics Act, because it was irrelevant to the federal criminal charges against him and was highly prejudicial since it was likely to confuse the jury and suggest that Fumo was in violation of state law.  <u>Id.</u> at *10. The Third Circuit rejected this argument, noting that evidence on the content and enforcement of the Ethics Act was "clearly relevant" in light of Fumo's theory of the case, <u>i.e.</u>, that no rules or laws barred employing Senate resources for his personal use, or that if there were such rules, they were vague, unclear, and unenforced.  <u>Id.</u>  The government's evidence showed that there were rules that Fumo broke repeatedly, that those rules were clear enough for him to understand, and that he was deceiving the

Senate when he misrepresented his expenditures.  Id.  Without
this evidence, the Court noted, it would have been very difficult
for the government to show fraudulent intent, an element of the
crime.  Id.  Similarly, the Third Circuit held that the trial
court had not abused its discretion in permitting testimony on
the state Ethics Commissions' disciplinary proceedings, advisory
opinions, and annual report, which it distributed to every state
legislator, because this evidence related to "whether Fumo was
aware of the Senate ethics rules, and thus had an intent to
defraud."  Id. at *11.  The Third Circuit noted, however, that
the government's expert had, appropriately, never testified as to
whether Fumo himself had violated the Ethics Act, or whether he
was guilty of any of the crimes with which he was charged.  Id.

     Given the very different set of circumstances presented in
Fumo, that case does not control the analysis here.  There, the
expert testimony related to a factual dispute regarding Fumo's
awareness of the ethics rules and his intent to defraud.  Here,
however, the proffered testimony before the ALJ did not relate to
any factual disputes.  The witnesses excluded by the ALJ had no
information relevant to M.D.  Slip Op. at 3-4.  For example, the
Board sought to include testimony from an attorney who represents
school boards, Nathanya G. Simon, Esquire, on "what services a
school district is required to provide to non-enrolled, privately
placed students under applicable federal and state laws and
regulations" and "whether the Board complied with applicable

federal and state laws and regulations." See id.; Letter from
Scott J. Good, Esq., to Amelia Carolla, Esq. (Apr. 3, 2009),
Defs.' Ex. D, Dkt. Ent. 21-4.  Clearly, such testimony would have
amounted to legal opinion.

Moorestown's reliance on First National State Bank v.
Reliance Electric Company, 668 F.2d 725, 731 (3d Cir. 1981), is
misplaced for similar reasons.  The issue in Reliance involved
whether a bank's acceptance of a lease that contained a
certificate of acceptance before goods were delivered diverged
from established custom in the banking industry, because this
would indicate that the bank lacked good faith and was not a
"holder in due course" of the disputed assignment.  The trial
court permitted an expert to testify on customs in the banking
industry to assist the jury in making this factual determination.
Notably, however, the expert was expressly precluded from
testifying on his opinion as to the legal duties arising from
such customs.  Id. at 731.  The Third Circuit affirmed this
finding, noting that such testimony was relevant, since it
provided information on whether the bank's conduct warranted
status akin to that of a holder in due course in light of
industry practices.  Id.  Like the Fumo case, the expert
testimony in Reliance was properly admitted to assist the jury in
making a factual determination.

Moorestown sought to admit expert testimony on the ultimate
legal determination of how the regulatory system operates and

51

whether the District complied with its statutory obligations. The proper place for such arguments was in Moorestown's briefs.  It is well settled that legal analysis and statutory interpretation are not proper subjects for expert testimony.  See Slip Op. at 11.  To the extent that Moorestown argues that such testimony is necessary to explain a "complex regulatory regime," which some courts have admitted in limited circumstances, see id. at *11-12, Plaintiff has not persuaded this Court that the IDEA's statutory scheme warrants such testimony or that it would be "relevant, non-cumulative and useful" in this context, see id. at *7-8, particularly since Moorestown has already described the regulatory framework in detail in its papers without the help of such testimony.  See id.; see generally Pl.'s Moving Br.

Accordingly, for these reasons and those set forth in this Court's prior Opinion, the Court rejects Moorestown's argument that the ALJ erred by barring its expert testimony.

### 4. Count VI: Statute of Limitations

Moorestown argues that a one-year period of limitations bars Defendants' claims.  See Pl.'s Moving Br. 33-34.  Plaintiff cites to Bernardsville Board of Education v. J.H., 42 F.3d 149, 158 (3d Cir. 1993), where the Third Circuit held that there was "a one-to two-year statute of limitations for tuition reimbursement claims."  See Chael P. v. West Chester Area Sch. Dist., 585 F.3d 727, 730 (3d Cir. 2009) (citing Bernardsville).  Bernardsville does not apply here.  Congress amended the IDEA in December 2004,

to include a two-year statute of limitations for tuition
reimbursement claims.  See id.; 20 U.S.C. § 1415(f)(3)(C).  The
only claims at issue in this appeal concern Moorestown's denial
of a FAPE in early 2008, when Defendants asked the District to
evaluate M.D. and develop an IEP for him, and the District
refused.  Since Defendants requested a due process hearing only
months later in September 2008, their claims are clearly timely.

### 5. Count VII: Tuition Reimbursement

Moorestown also argues that Defendants are not entitled to
full reimbursement for the 2007-08 and 2009-10 school years.
First, the District contends that it did not receive notice of
Defendants' request for evaluations and an IEP until the middle
of the 2007-08 school year, so it should not be forced to pay the
entire year's tuition.  Defendants respond that Moorestown was
required to have in place an IEP for M.D. at the beginning of the
school year.  As discussed supra, since Defendants had rejected
Moorestown's prior IEP and withdrawn him from the District,
Moorestown would have had no notice in the fall of 2007 that
Defendants wished to participate again in its special education
program.  Indeed, it would have had no reason to develop an IEP
for a child it believed did not want District services,
particularly since his prior IEP was not under administrative or
judicial review and M.D.'s parents had not yet requested
reevaluations.  The IDEA requires a school district to offer a
FAPE, not impose a FAPE upon a disinterested student.

53

Accordingly, the Court rejects this argument.

Defendants also argue that they should be awarded the full 2007-08 tuition because their request for an IEP would have been made earlier but for the District's misrepresentations that (1) they never paid for anyone to attend Orchard; (2) M.D. could not attend at District expense because it was not on the "approved" list; and (3) M.D. had to "re-enroll" to obtain an IEP for the District. Moorestown claims it never made any such misrepresentations. According to the District, its officials explained that M.D. could be placed at Orchard only by way of a "Naples" placement, and Defendants nevertheless chose to dis-enroll M.D. and place him at Orchard at their own expense. Pl.'s Reply 12-13. Moorestown also notes that this argument was considered and rejected by the ALJ. Id. According to the ALJ's opinion, it was Dr. Hoffman, M.D.'s parents' advocate, and not Moorestown, who informed C.D. that Moorestown does not send students to Orchard and that the family could not be reimbursed for such a placement. ALJ Op. 25. The Court sees no reason to disturb the ALJ's findings of fact on this point, particularly since Defendants have failed to cite any authority for these arguments or provide any support for the assertion that they would have requested an IEP earlier but for these alleged misrepresentations.

The IDEA permits tuition reimbursement for unilateral private school placements where the LEA did not make a FAPE

available to the child in a timely manner.  20 U.S.C. §
1412(a)(10)(C)(ii).  Typically, courts have calculated the
accrual date as the date that the parents put the district on
notice of their dissatisfaction.  See, e.g., Bernardsville, 42
F.3d at 160.  Usually, this occurs when the parents reject the
IEP and enroll the child in private school.  Id. (tuition
reimbursement claim accrued when parents moved child to private
school and placed in issue their dissatisfaction with student's
IEP by petitioning for administrative hearing).

Here, however, the Court is faced with the unusual context
where the child was already attending a private school when the
district denied him a FAPE.  In this scenario, courts have
calculated tuition claims from the point at which the school
district should have acted; i.e., the date Moorestown should have
offered M.D. an IEP.  See, e.g., Dist. of Columbia v. Abramson,
493 F. Supp. 2d 80, 86-87 (D.D.C. 2007) (where district refused
to determine student's IDEA eligibility, it was required to
reimburse parents for child's tuition from date that
determination should have been made until time student was
provided with appropriate placement).

Courts must use their discretionary power to grant
appropriate relief after a "just and proper consideration of the
equities".  Bernardsville, 42 F.3d at 160 n.16.  The equities in
this case weigh in favor of adopting the Abramson approach,
because unlike the Bernardsville school district, Moorestown had

not had continued contact with M.D. or continued assessments after his unilateral placement at Orchard.  Moorestown was not put on notice of M.D.'s need for a FAPE until it received the January 30, 2008, letter, which made clear Defendants' desire for evaluations and an IEP meeting.  Moorestown notes that it had a period of 20 calendar days to respond, N.J. Admin. Code § 6A:14-2.3(h)(5), followed by 60 days to complete the re-evaluation and hold an IEP team meeting, N.J. Admin. Code § 6A:14-3.8(e).[16] Pl.'s Moving Br. 36.  It would be unfair to require Moorestown to reimburse Defendants for tuition during the 80-day window of time it had to fulfill its obligations under the Act. Defendants were not entitled to tuition reimbursement until M.D. actually failed to evaluate him and convene an IEP meeting during the statutory period.  Moreover, Defendants knew they would be responsible for paying M.D.'s private school tuition until Moorestown proposed an IEP.  Since the District should have performed the evaluations and convened the IEP meeting within roughly 80 days of January 30th (or April 19th), Defendants' tuition reimbursement claim shall be prorated accordingly.

Moorestown also argues that the ALJ erred in ordering reimbursement for the entire 2009-2010 school year because the ALJ did not hold that Orchard Friends became M.D.'s "stay put" educational placement under the IDEA.  Pl.'s Moving Br. at 37.

---

[16] Since the operative date is when Moorestown <u>should</u> have made a FAPE available to M.D., the Court does not include in its calculation the 15-day time period that the parents would have had to consider the proposal before its implementation.  N.J. Admin. Code 6A:14-2.3(h)(2).

This argument is moot.  The Court granted Defendants' preliminary injunction motion designating Orchard as M.D.'s pendent placement.  As such, M.D. was entitled to remain there pending the District's appeal in this matter, with such placement funded by the District.  Dkt. Ent. 11; 20 U.S.C. § 1415(j).

**6. Defendants' Counter-Claim for Attorney's Fees**

Under the IDEA's fee-shifting provision, a district court may, at its discretion, award reasonable attorney's fees as part of the costs to a "prevailing party who is the parent of a child with a disability."  20 U.S.C. § 1415(i)(3)(B)(i)(I).  In determining the amount of the attorneys' fees, the Act provides that they "shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished."  20 U.S.C. § 1415(i)(3)(C).  A plaintiff "prevails" within the meaning of this provision, "when actual relief on the merits of [the] claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." P.N. v. Clementon Bd. of Educ., 442 F.3d 848, 855 (3d Cir. 2006), cert. den'd, 549 U.S. 881 (2006) (quoting Farrar v. Hobby, 506 U.S. 103, 111-12 (1992)).  Here, Defendants obtained significant relief, namely, a ruling that the District cannot require enrollment prior to the development of an IEP, and an order requiring reimbursement of tuition for M.D.'s private placement.

Moorestown has not disputed that Defendants are prevailing parties.  Instead, it argues that Defendants' limited success warrants a reduction in their fee application to account for the fact that they did not win tuition reimbursement for the 2006-07 school year or for the entire 2007-08 school year.  The Court will address this argument after Defendants have submitted their fee petition in accordance with the local and federal rules. Accordingly, Defendants shall submit their fee application with documentation separating the successful claims from the unsuccessful ones to the extent possible.  <u>See</u>, <u>e.g.</u>, <u>Hurley v. Atlantic City Police Dept.</u>, 933 F. Supp. 396, 429 (D.N.J. 1996), <u>aff'd</u>, 174 F.3d 95 (1999); <u>cert. den'd</u>, 528 U.S. 1074 (2000).

Moorestown also argues that under 20 U.S.C. § 1415(i)(3)(D), the Court may not reimburse Defendants for their attorneys' fees because they rejected Moorestown's settlement offer on February 4, 2009, of $70,000, an amount that is greater than the final relief they obtained.  Defendants argue that this provision does not apply because Moorestown never made a <u>written</u> offer of settlement, and the offer was made <u>after</u> administrative proceedings had begun.

Section 1415(i)(3)(D)(i) provides that attorneys' fees may not be awarded in any action "subsequent to the time of a <u>written</u> offer of settlement to a parent" if (1) the offer is made more than 10 days before the administrative proceeding begins, (2) the offer is not accepted within 10 days, and (3) the court finds

that the relief finally obtained by the parents is not more
favorable to the parents than the offer of settlement.  Since
Moorestown did not respond to Defendants arguments in its Reply
papers, the Court deems the issue conceded.   In any event,
Moorestown apparently admits that the offer was oral and not
written, so this provision would not apply anyway.  The District
never disputed Defendants' contention – supported by M.D.'s
father's sworn affidavit – that they never received a written
settlement offer from Moorestown.  Further, the record reflects
that the settlement offer was made <u>after</u> the administrative
proceeding had begun.  Defs.' Opp. Br. 32 (citing Defendants'
billing records and S.D. Decl., Dkt. Ent. 39-1).  Accordingly,
the Court rejects this argument.

### V. CONCLUSION

For the foregoing reasons, both motions for summary judgment
are denied, in part, and granted, in part.  Additionally,
Moorestown's motion to file a summary judgment brief in excess of
the limit set by the Local Rules is denied.  An appropriate Order
shall issue herewith.


Date:  _September 15, 2011_             s/Renée Marie Bumb
                                        RENÉE MARIE BUMB
                                        United States District Judge